ORIGINAL

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 15 2007

at 8 o'clock and 20 a.m. M
SUE BEITIA, CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JOHN RENO,                           )
                                     )
            Plaintiff,               )
                                     )
      v.                             )      No. CV 02-00808 MEA-KSC
                                     )
UNITED STATES OF AMERICA,            )
                                     )
            Defendants.              )
                                     )

**MEMORANDUM ORDER AND OPINION**

MARVIN E. ASPEN, District Judge:

Defendant United States government, which operates the medical facility at which plaintiff John Reno underwent knee surgery and several rounds of post-operative treatment in 1999, moves for summary judgment. The government argues that Reno's claims are not supported by competent evidence – in this case, probative expert opinions – and that Reno therefore fails to create a genuine issue of fact for trial. For the reasons stated below, we grant the motion and terminate this case.

I.    **BACKGROUND**

In 1999, Reno checked into the United States government-operated Tripler Army Medical Center (Tripler) for treatment of a knee injury. On June 25, 1999, doctors at Tripler performed a surgical reconstruction of Reno's anterior cruciate ligament. (Ex. A to Def's. Br. at 5-8.) According to medical records attached to the government's motion to dismiss, Reno was discharged the next day without any sign of complications. (*Id.* at 13-14.) Reno returned to Tripler on July 5, 1999 and again on July 6, 1999, with redness in his knee, a fever, pain, and swelling. (*Id.* at 15-16.) On July 6, 1999, doctors discovered Reno's knee had become septic

and admitted him to Tripler that day. (*Id.* at 16.)  He received antibiotics and two irrigation procedures, and also received a central line through which long-term antibiotics could be administered. (*Id.* at 23.)  Reno was discharged on July 22, 1999. (*Id.* at 24.)  At that time, he did not have a fever, his vital signs were stable, and he was prescribed continued antibiotic treatments and physical therapy. (*Id.* at 24-28.)

On July 30, 1999, Reno was again admitted to Tripler, this time for a condition called neutropenia, an abnormally low number of a type of white blood cells. (*Id.* at 29-31.)  Doctors believed a reaction to the antibiotic treatments may have caused the neutropenia. (*Id.* at 31 & 33.)  Reno's white blood cell count improved by August 1, 1999, and he was discharged. (*Id.* at 31.)  Reno had a follow-up visit with Dr. Harpstrite, his attending physician at Tripler, on August 31, 1999. (*Id.* at 34-35.)  At that time, Reno was still undergoing physical therapy, and he did not note any fever, chills, knee drainage, or other complications. (*Id.*)  By September 17, 1999, Reno had nearly a full range of motion in his left knee with no complications. (*Id.* at 36.)  However, at some point following the surgery, Reno allegedly suffered what he referred to in the Complaint as "a massive and rapacious infection." (Compl. ¶ 10.)  Reno alleges that the physicians and treating staff at Tripler failed to:  1) maintain sanitary conditions during the July 25, 1999 surgery; 2) properly treat Reno during the June 25, 1999 and July 6, 1999 surgeries; and (3) properly diagnose Reno's condition following the two surgeries. (Compl. ¶¶ 11-13, 15-16.)

## II.    PROCEDURAL HISTORY

Reno filed his Complaint on December 17, 2002.  Reno alleged five counts: negligence/medical malpractice, negligent failure to obtain informed consent, negligent recruitment and retention, negligent supervision, and negligent infliction of emotional distress.

(Compl. ¶¶ 18-32.)  On December 8, 2003, this case was reassigned to us.  On December 20, 2005,[1] we entered a new scheduling order, providing that Reno's expert witness disclosures were due by July 5, 2006 and the government's responsive expert witness disclosures were then due by August 4, 2006.  (*See* Dkt. No. 57.)  The schedule did not provide for Reno to serve further expert reports in rebuttal.  (*Id.*)  We set a discovery cut-off date of November 6, 2006.  Reno filed an expert declaration by Dr. Bernard A. Michlin, M.D., on April 8, 2006.  Reno also filed a July 5, 2006 report related to damages issues by Dr. Jack P. Suyderhoud, Ph.D.

The government now files a motion for summary judgment, arguing that in a medical malpractice case such as this, Reno must establish the elements of his case – the standard of care, breach of that standard, and causation – through expert opinions, and that Reno has failed to do so.  (Gov't Br. at 10-12.)  The government also asserts that as part of his informed consent claim, Reno must use expert testimony to establish the materiality and nature of the risks involved with his treatment.  (*Id.* at 12-13.)  Reno's failure to do so, the government argues, is fatal to his informed consent claim.  (*Id.*)  In response, Reno states that he "provides more than sufficient evidence herein to present material facts in dispute." (Reno Opp. Br. at 4.)[2]

---

1    Delays and continuances for the most part are attributable to locating plaintiff and his ultimate retention of counsel.

2    Reno filed a stand-alone Motion for Extension of Time to Complete Discovery before the government filed this motion (Dkt. No. 63.).  Although he appeared to argue in his opposition brief that he needed additional time and expert discovery to oppose this motion for summary judgment (Opp. Br. at 4), Reno clarified at oral argument that he needs additional discovery only to advance his case in the event summary judgment is denied here.  (1/29/07 Hr'g Tr. at 3.)  In other words, it is Reno's position that he has already offered sufficient evidence to withstand summary judgment and is not requesting further time prior to the ruling on this motion to do so.

## III.   STANDARD OF REVIEW

Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED R. CIV. P. 56. "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party moving for summary judgment must initially identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotations omitted).  Once the moving party meets this burden of production, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial."  FED. R. CIV. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Here, once the government identifies the pleadings and/or other evidence demonstrating the lack of a genuine issue for trial, Reno must set forth "significant probative evidence tending to support the complaint." *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cit. 1987).

-4-

## IV.   ANALYSIS

### a.   Negligence Claims

Reno alleges that the Tripler doctors failed to "maintain sanitary conditions" during his July 25, 1999 surgery and to properly treat him following the surgery, and that these alleged failures caused Reno to suffer a "massive and rapacious infection." (Compl. at ¶¶ 10-16.) Reno must eventually be able to show that: (1) Tripler had a legally cognizable duty to meet the relevant medical standard of care; (2) Tripler breached that standard of care; and (3) that breach caused Reno's injuries. *Craft v. Peebles*, 893 P.2d 138, 149 (Haw. 1995); *Knodle v. Waikiki Gateway Hotel, Inc.*, 742 P.2d 377, 383 (Haw. 1987). If there is no genuine issue of material fact supported by probative evidence with respect to these elements, the government is entitled to summary judgment. *T.W. Elec. Serv.*, 809 F.2d at 630.

The government points to Reno's medical records at Tripler, which show that Reno was discharged in June and July 1999 with no complications or infections from his knee surgery, as evidence that Reno's alleged injury was not caused by his treatment at Tripler. (*See* Ex. A to Def's Stmt. of Facts.) Further, the government argues that because the pleadings, documents, and affidavits do not contain the necessary expert support for Reno's medical malpractice claims, the government is entitled to summary judgment.

The Hawaii Supreme Court has explained, "[i]t is well settled that in medical malpractice actions, the question of negligence must be decided by reference to relevant medical standards of care for which the plaintiff carries the burden of proving through expert medical testimony." *Craft*, 893 P.2d at 149 (citing *Nishi v. Hartwell*, 473 P.2d 116, 121 (1970)). Absent an obvious medical error – an exception "rare in application" – such as leaving a sponge in a patient or

operating on the wrong part of the anatomy, expert testimony is necessary because "a jury generally lacks the 'requisite special knowledge, technical training, and background to be able to determine the applicable standard without the assistance of an expert.'" *Id.* (citing *Rosenberg v. Cahill*, 492 A.2d 371, 374 (1985)).

Medical malpractice causation must also generally be supported through expert opinions. *See Bynum v. Magno*, 125 F. Supp. 2d 1249, 1258 (D. Haw. 2000). Further, this expert testimony must have some probative value; conclusory expert opinions do little more to defeat summary judgment than do conclusory party allegations. *See Acoba v. General Tire, Inc.*, 986 P.2d 288, 301 (Haw. 2000). ("Although expert testimony may be more inferential than that of fact witnesses, in order to defeat a motion for summary judgment an expert opinion must be more than a conclusory assertion about ultimate legal issues.") (citation omitted); *see also Ferguson v. District of Columbia*, 629 A.2d 15, 20 (D.C.App.1993) (FRCP Rule 56(e) "applies equally to affidavits submitted by experts .").

Here, the only expert disclosure related to negligence that Reno filed before the discovery cutoff was the seven-paragraph declaration of Dr. Bernard A. Michlin, M.D. (*See* Ex. B to Reno Stmt. of Facts.) That declaration, which was not accompanied by an expert report, states the following opinion on Tripler's alleged negligence:

> Based upon my review of John Reno's medical records at Tripler Hospital in the summer of 1999, and based upon medical probability, it is my opinion that the medical treatment rendered by Tripler Hospital medical staff to John Reno was below the medical standard of care or was breached to have been treating John Reno with antibiotic therapy without doing CBC's to observe for any complications such as in his case severe leukopenia.

> Based upon medical probability, the failure by Tripler Hospital
> medical staff as a result of the breach of the medical standard of
> care is a proximate cause of John Reno's resultant injuries and
> damages.

(*Id.*) Beyond the statement that he reviewed Reno's medical records – which the government has used to show that the Tripler doctors conformed to medical standards of care and that Reno left Tripler in satisfactory condition – Dr. Michlin provides no explanation of his methodology, no explanation of acceptable medical practices with respect to the type of treatment Reno received, and no basis for his statement that "medical probability" suggests a breach or causation here. This declaration is insufficient to withstand summary judgment.[3]

### b.   Informed Consent

In Hawaii, the "patient-oriented" standard – "what a reasonable patient needs to hear from his or her physician in order to make an informed and intelligent decision regarding treatment or surgery" – applies when evaluating an informed consent claim. *Carr v. Strode*, 904 P.2d 489, 498-99 (Haw. 1995). However, this standard does not relieve plaintiffs of the need to establish the materiality of risk information a doctor must disclose prior to treatment. *Id.* at 500 (expert testimony necessary to adduce "the nature of risks inherent in a particular treatment, the probabilities of therapeutic success, the frequency of the occurrence of particular risks, and the nature of available alternatives to treatment." *Id.* at 500 (citation omitted). Here, the

---

3

      Reno also points to the expert report of Dr. Stephen J. Morewitz, Ph. D. in support of his causation claim. (Reno Stmt. of Facts ¶ 4.)  However, Dr. Morewitz expressly disclaimed any opinion on causation: "It is also irrelevant whether Mr. Reno's current problem resulted from medical malpractice or not with respect to my analysis. The fact that he suffered the complication is the only relevant inquiry under this analysis." (Ex. C. to Reno Stmt. of Facts.)

government presented evidence that doctors discussed with Reno the risks of infection, stiffness, and potential continued instability in Reno's knee. (Ex. A. to Def's Stmt. of Facts, at 3.) Reno also signed a written consent form prior to surgery. (*Id.* at 4.) In response, Reno does not address the government's arguments or evidence through expert evidence or otherwise. Accordingly, we grant the government's motion for summary judgment with respect to Reno's informed consent claim.

## V.    CONCLUSION

For the reasons stated above, we grant the government's motion for summary judgment.[4]

It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated: 1/15/07

---

4       Our ruling on this motion renders Reno's motion for further expert discovery moot.